Case number 16-5298, Edward J. S. Ford, Jr., appellate, v. Charles Massarone, Commissioner of the United States Parole Commission, et al. Mrs. Schall, for the amicus curiae. Mr. Kacheloff, for the appellees. Mr. Schall. Thank you, and may it please the Court. My name is Zach Schoff, as amicus, supporting appellant Edward Ford, and I'm hoping to reserve three minutes for rebuttal. So my plan today is to spend a few minutes discussing what I view as the key merits issue here, which is the ex post facto claim based on the timing of D.C. Code parole hearings, and then I'll circle back to whichever of the procedural issues the Court has questions about. So I don't think there's a genuine – Mr. Schoff, you don't think the key issue is your statutory claim? So I think the statutory claim is a predicate to the ex post facto claim. In that case, probably you should start with the predicate, if you don't mind. Sure. So I think the preexisting D.C. law is clear that the parole commission, the D.C. Parole Board, and now the Parole Commission are obligated to apply D.C. parole law to D.C. sentences. That includes all of the rules, regulations, and guidelines of the D.C. Board of Parole. The approach the commission has taken here violates that rule because – Did Mr. Ford make this argument below, or did the district court analyze the statutory claim below? So I think the answer is yes. The district court's decision addresses this issue at pages 23 to 24. Did it talk about the statutes at all? It talks about – It talks about delay, right? It talks about delay, and it talks about the Seventh Circuit's decision in Thomas. It basically adopts the government's argument, which had teed up this issue, and this is N.A. 47 and 50 to 51, by telling the court that the practice that they have adopted of delaying the D.C. code parole hearing is okay based on the Seventh Circuit's decision in Thomas. If you look at Thomas, Thomas identifies and analyzes all of the statutes that we rely on in our brief and that the government knocks forward for failing to cite below. Did the district court discuss the validity of Thomas? I don't think the district court – It's not obvious the district court considered departing from Thomas, but I think that the district court read Thomas, found it persuasive, agreed with Thomas, and as a result adopted the government's view and disagreed with the argument that the board had raised and the government had teed up. And just on this preservation issue, I think the key point from my point of view is that there's nothing to be gained by not addressing an argument that was not just addressed by the district court, but that was addressed by the government itself below. And on this point, and this is I think the key feature in both the statutory argument and in the ultimate ex post facto claim, that delaying the DC parole hearing isn't just some procedural change, it has a substantive effect. And the reason for that is that district law has set up a system where the earlier and the more frequently someone has their parole hearings, the lower they can reduce this grid score which governs parole decisions under DC law. So can I ask a conceptual question about the connection between the statutory claims and the ex post facto claims? Yeah. So it seems like the ex post facto claims is going to be something you could press even if the regulation is not ultra viris under the statutes, right? Because then you would say, well, the regulation might be fine, but it's still something that came into being after the fact, and so you'd have to apply the pre-existing regime to our client. I mean, I'm sorry, to Mr. Ford, not your client. Right. So we agree with that. I mean, there's no authority for delaying Ford's parole hearing here aside from 28 CFR 265, which is issued in 1989. And you can sort of have two views of that regulation. One is that it's just new. Two is that it's new and invalid. But I think you only have to agree with the first piece to give Ford the predicate for his ex post facto claim. So then getting back to the question of preservation, because I don't want to stop you from making the statutory argument because I'm interested in that as well. But on preservation, it seems like if all somebody asserts is an ex post facto claim, it's not necessarily the case that they're also preserving a predicate statutory claim because the ex post facto claim exists regardless, right? So I think that's right. In this case, these arguments are so close together. I think it's fair to read one as preserving the other. So this Thomas decision that the government and the district court relied on is a 1992 decision and came into play before actually the commission took over the duties of the D.C. Board of Parole and just holds that the approach of the commission is lawful. But the reasons why you think that it's lawful are also the same, or the reasons, I guess I should say, you think that approach is unlawful is the same reasons you would think that there is an ex post facto problem here, and that's that it alters the substantive standards of D.C. parole law. That creates a problem under, among other things, D.C. Code 24-209 and also under the ex post facto clause. Yeah, and I suppose one could say that if you want to avoid a constitutional question, then you could resolve it on statutory grounds as another, potentially another reason maybe to. I mean, that's right. I mean, we certainly think that the decision in Thomas approving this approach is wrong for the reasons we give in our brief and that there is an ex post facto problem as well. And just to get back to this core issue of the change in standards, so the way it works under the D.C. parole law applicable to Ford is each time you come before the commission, you have the chance to lower this grid score, which is. Can I take you away from that again? I'm sorry, because I'm not sure that the statutory claim is really can be separated from the ex post facto in a way that helps you. So I want to ask about that. So what is the comparator that yields 2000? I'm going to use that rather than 2002. 2000 as the date rather than 2005. What is the earlier law that you are looking at? So I think the earlier law is the D.C. Board of Parole regulations. And we're talking about the 1987 regulations here. But those weren't regulations about mixed cases. And if you look at J.A. 213, this is a letter that or a memo that Mr. Ford received in 1990, which is in the first paragraph says when you receive your consecutive D.C. code sentence of 20 years to life, your parole eligibility date was computed to be May 22, 2010. So that says that his original, as calculated at the time, was 2010. That, I think, has to be a consequence of pre-Chapman Bay analysis, right? And that's actually the way you describe in your own brief what the consequence of pre-Chapman Bay would be. Then the next paragraph says new policies now dictate the way parole eligibility dates are computed, and I've determined your new parole eligibility date will be 2000. That's the consequence of Chapman Bay. But since Chapman Bay did not exist until after your client committed his offenses, on its face it looks like he does better under the new rule than he would have done under the rule at the time, which was 2010. What's the answer to that? So the answer is the way to think about Chapman Bay is it holds that this previous calculation, the one that yielded the 2010 date, was just unlawful. That may be right, but that doesn't necessarily mean that it's a comparator. Even an unlawful original rule is still the comparator for purposes of the Ex Post Factum Clause. The Supreme Court held the challenge was to a death penalty received by the defendant, and he said, well, you couldn't have given me the death penalty on the date of my offense, because although there was a death penalty statute on that date, the Supreme Court since then held it unconstitutional. So he said that there was really no death penalty statute on the date. The Supreme Court said that's, quote, sophistry, and that statute's not removed for ex post facto purposes by the fact that we later declared unconstitutional. So your argument is you don't dispute that his original date was 2010 and he did better. Your dispute is that the 2010 date was unlawful, right? We think that the 2010 date was unlawful, but it's unlawful in a different respect than the scenario you were just talking about. That case invalidated, just going from your description, a statute where the statute existed and that was invalidated. Here what we have is this Court takes an administrative interpretation of the statute and says that interpretation you have has never been the law. So I think the appropriate comparator in that kind of case is— Well, that's not quite what they say. They said that was the law before, that was the way it was done before, and now for the reasons we give in this opinion, we think it should be done this way. It's not so much Chapman Bay can be read as saying anything that happened before is vague. It certainly didn't address that question. I mean, we agree that it didn't address the question, but I think the baseline is it was interpreting what D.C. and U.S. Code law had always been. So, but even if you're right, it all depends on not only Chapman Bay, but also your interpretation of the statute, right, your statutory interpretation. You can't win your ex post facto claim unless your interpretation of the statute is correct. So in that sense, it is a predicate. So I will answer that question in a second. I guess one other point about this discussion we've been having about the 2010 date is that's not an argument the government has ever made here, so I think it's not really in the case. On the predicate question, I think there's two different ways you could look at it. The way I think you should look at it is the question you ask is, is there anything in preexisting D.C. or federal law that authorized the commission to do what it did here and push back for its parole hearing? The answer to that question is no, and my first line answer is that should be enough. But if you disagree with me about that, then the question should be, well, at the bare minimum when you have a rule that is contrary to the prior D.C. Code law for all the reasons we give in the brief, then there at least you have the predicate for an ex post facto violation. If I may reserve the balance of my time. Well, before you reserve the balance of your time, are you giving up any of your other claims regarding ex post facto? We're not giving them up. Your last one, your second one, you sort of concede the ambiguity of the memorandum upon which it relies. Is that right? That's right. I mean, that argument. I'm asking you as amicus here. You're not counsel. You're amicus. Do you agree that with respect to the second one, there really isn't enough? I think it is. The second of your independent claims. I think it's ambiguous. We would say that on the, you know, we're on summary judgment here, so you resolve ambiguity in the board's favor. The other piece of that argument that I will concede in candor is that piece, unlike the sort of parole hearing date argument, I would concede wasn't raised or addressed by the court or by Ford below. So that is a new argument. And we also maintain the argument about the grounds on which the commission denied Ford parole. But, you know, again, in candor, there's only a very narrow space you can try to fit that argument in after Bailey. So in terms of— That's the first of what you call your independent claims, is that right? I'm getting lost on the numbers, but it sounds like you had two what you called independent, different than the delay claims. That's right. So number one is about the set-off date and using the same reasons for the set-off and then denying parole at the set-off. And number two is using the three murder convictions as a predicate for unusually violent criminal conduct when the policy guideline says you need five. So those are the two other arguments. And then there's the due process argument. All right. Leave that aside. For both of those, you think Bailey gives you trouble, and at least the second one you don't think was not as clearly raised below as other ones. The set-off one I think wasn't as clearly raised below. The piece about the number of prior convictions is addressed in the district court's opinion, and I think it's fairly in the case. Can I ask you one question before you sit down? I just have one more. I think it's what you call the set-off claim. That's the same factors being used for both? Correct. Yeah. So there you say there is a new and different rule that was applied? Yeah. But no citation as to what that new and different rule was? Right. You have a citation for that? I think the new and different rule is just not to apply the principle from the memorandum about not using the same factors. We don't have a specific rule that was applied. This goes back to the Bailey question. If you treat that second part of Bailey as binding, then that is a problem for that argument, too. You try to distinguish that with respect to your three murders argument on the ground, that Bailey wasn't a case where there was a clear current rule that if you applied it would apply, but there is no clear current rule even as to that one as to the set-off claim, right? That's right. I agree with that. Back to your delay argument, your delay series of arguments. So in this kind of situation, if it were true that the regulation comes into effect and either it can't be applied retroactively to Ford or that it was in violation of the statutes to begin with, what's the relief in that sort of situation given that the concern is that hearings should have happened that didn't? You can't undo that. Right. So I think the remedy here is actually pretty straightforward and has been done before. The Commission, when it's had previous regulations invalidated as violating the Ex Post Facto Clause, has just gone back through each of the prior hearings and reconsidered them and sort of figured out what it would have done had the current rules applied. That's right. And we cite to those Federal Register Notices at I think pages 49 and 50 of our opening brief. So under the 1987 guidelines, is there really any practical limitation on the discretion that the Board or the Commission exercise? We seem to think not in Bailey, right? So I think the answer under Bailey, I think, is there's very broad discretion. That doesn't really matter for our main Ex Post Facto claim because the same is true for the U.S. sentencing guidelines. There's very broad discretion. No, but that's a very different world in Pew than we have here, right? I mean, in the world in Pew, there's a safe harbor for a guideline that's within range. There's nothing like that here, right? So I think it's more alike than it is different, but just on this question of whether broad discretion gets rid of the Ex Post Facto problem, I can bailey answer that question, no. But on the specific point of the sort of similarities and differences, at the district court level, and the district court is not allowed to presume that a within-guidelines sentence is reasonable, so there is no safe harbor there. The main obligations are two. Number one, you've got to calculate the guidelines range correctly. If you don't, that's procedural error. We have the same thing here. If the commission doesn't get the grid score right, it goes back and recalculates. But this isn't about the grid score, right? I mean, none of these parole hearings have been about the grid score. What they've been about is the fact that your client murdered three people over a three-month period of time in three unrelated accidents. And that seems to, in every case, have swamped all other considerations. And it seems to me, under Bailey, that that's perfectly reasonable for a board to do that, a board or commission to do that. Isn't that what you're running up against at the end of the day? So we read the commission decisions differently. I think I agree with you, or rather, I guess what I would say about the commission's decisions is they're pretty terse. It's hard to get at what the reasoning is because they're kind of boilerplate and there's a few sentences. But I think the right way to read them is that the commission is balancing the grid score against these factors, these murderers, that it thinks might warrant a departure. That, I think, flows from the presumption that the board and the commission follow D.C. law, which is very clear that the grid score is an actuarial parole assessment that you have to use to assess someone's level of risk. And so absent something in the decisions to the contrary, that's the presumption this court should have, too. And I think imagining that the court is doing or the commission is doing what the government suggests in its brief and just ignoring the grid scores in these departure cases would render these decisions just irrational. I didn't mean to suggest they're ignoring the grid scores. It's just that there's another factor out there. So, I mean— Dangerousness. We agree that there's another factor. But if you think there's another factor that's being balanced against the grid score, then it matters tremendously getting that starting point right. And that is really our exposition to the claim. Thank you, Your Honor. Good morning. Peter Kaffenroth for the United States Parole Commission. This case, as Judge Griffith was just pointing out, is really about whether Mr. Ford poses a risk. And he does pose a risk in the view of the commissioners. And in light of that risk, you know, regardless of whatever his grid score may have been, they have time and again reasonably rendered a conclusion that he cannot be paroled at that time. And the court also correctly pointed out that this appeal is presenting a host of issues that were not presented below. And in light of that— I don't understand the first argument you started with because it seems to me it just treats the grid as just entirely irrelevant. Why isn't it the case? Obviously, the grid has some work to do. Otherwise, why have it? Right. And it at least has an anchoring effect in that it tells you this is a number that you start with. You may be absolutely right that you can depart from that number, and the reasons that caused somebody to deny parole could cause them to deny parole again. But if you start from a different point, that seems like something of consequence. But you're treating it—it seems to me you're treating it as if it's of no consequence. I'm not saying it has no consequence. As each of the decisions of the commission has noted, it's identifying what the grid score is, and then it says, but wait, there are these other things that sort of subsume the grid score, and that is the fact that the grid score does not adequately account for the fact that this gentleman— Right, but it just seems to me, like suppose the commission said explicitly, we start with a three. He's done some great things, but given that we start with a three, I can't give him parole. Had he started with a two, it might be different. Suppose they said that. Then we know to a moral certainty that where you start with matters. Right? Right. First of all, I would say that under Phillips, the question at this point is, is there harm today to Mr. Ford from the most recent parole hearing that's in the record? And I submit that there is not, because even at that time, the grid score indicated in 2012 that he should be paroled. There's also this 2016 one, which the court can or can't look at. But even at that time, he's been indicated for parole now since 2010. And time and again, regardless of that score, they have said, but wait, you're too dangerous, and the grid score doesn't adequately account for that. Well, we haven't had a situation where he was a zero. No, that presumably, if he's continuing to complete coursework, will occur next time. So you have an argument that when he was a three, even if he would have been a two, it wouldn't have mattered because we know what they did when he was a two. And when he was a two, it wouldn't matter because we already know what they did when he was a one. But we don't have the last point, which is what makes the case not move, as far as I can tell. Because we don't know what would happen if it was a zero. We also don't know about the additional delay time and all that, right? I mean, the additional amount of time that he would have served. I submit that the analysis of the Parole Commission, each of the times, ever since 2010, that it's looked at Mr. Ford, all of those times, the score has already indicated he should be paroled. But they've never said we're never going to let you out until the end, have they? No, and I don't think they will say that. Every time they're going to look at him at that moment and say, will you pose a risk if paroled this year? And thus far, they have determined that he would pose a risk in each year. But I'm never asserting, the Parole Commission is not asserting that he will never be suitable for parole. I think that is an overall assessment of Mr. Ford at that time. There may come a time when, frankly, he is old enough and not strong enough to pose the risk that they're afraid he would pose if paroled. But that's not the case yet, or at least it hasn't been in the various parole hearings that are currently before the court. What do you do about the Daniel case with respect to your argument that there's complete discretion and it doesn't matter? The questions that Judge Griffith was asking about to the extent to which the guidelines or the grid makes a difference. Again, the question isn't whether they are considered. They do, they are considered, and they are a factor. Right, but in Daniel, we said that notwithstanding the fact that the board could depart in unusual circumstances, which is the same in the 87 rules in that respect, the fact that the grid changed, that the grid was different than it otherwise would be, was enough for ex post facto. Why isn't that the case here? Because the actual factors that the commission was assessing at every time for Mr. Ford on the facts of Mr. Ford. It has to be under Phillips and assessment. As to this offender, he's always said... So you're not relying on the general fact that the 87 guidelines give discretion, and you're relying on specifically how they did it in this case? Right, and under Bailey, that's exactly the individualized inquiry that the commission is required to undertake. Can I ask about the statutory claim? Yes. So how many... In Thomas, there were 200 people left in the circumstance. That was in 1992. Right. How many now? I don't have an exact number for the court, but my understanding is it's about a dozen. A dozen. So the arguments in the brief about how difficult this would be if there were the different rule in the Seventh Circuit than there is in this circuit, we're only talking about a dozen people. So this is not one of these cases where significant differences across the country really make much difference. Is that fair? I think any time a circuit split arises, it is of concern to the federal judiciary broadly, but in terms of the actual effect on the number of persons similarly situated to Mr. Ford, it is a relatively small number. And we don't know how many are being held in the Seventh Circuit, do you? No, we don't. There are some very large prisons in the Seventh Circuit, but I don't have that information for the court to know. Was he held in Florence or something? I think he's now in Florida. I think he's at FCI Coleman. It's in the Certificate of Service at the back of the brief. But not in the Seventh Circuit. Not to my knowledge. I haven't actually gone on to the website where you can type in his number and see where he is today. So what is your answer to their statutory claim? Do you agree that it seemed like, at least in places, the government agreed that the D.C. parole requirements are supposed to apply to D.C. defendants? That is how we've looked at the issue, although Your Honor raised some very valid points. So if that is the case, then what's the explanation for having a different rule about the date of the hearing than the date of eligibility? I'm sorry, the date of eligibility. As the Seventh Circuit, I think, cogently explained in Thomas, there's work to be done to harmonize the federal and D.C. systems, and that's also a principle that arose in Chapman Bay. Once we have Chapman Bay, I'm wondering what the work to be done is. What is the work to be done? Is this just a policy question about which is better? I mean, the principal arguments that I understand from your brief is that we want to have the person not have the parole hearing until they're closer to the time. This is, I don't know, something more that we hold over their head. Otherwise, they'll think they're free, but of course they're not because they're still held on a federal charge. So that's a policy argument. That's not a textual argument at all. No, the truth is one could. Chapman Bay says what it says, but I think to some extent there are policy underpinnings for both Chapman Bay and Thomas. Do you read Chapman Bay to say what the law always was? I do not. I think it was an evolution, and for ex post facto purposes, it is a new articulation of what the law would be prospectively from that time. But when you're doing an ex post facto analysis, you're looking at what, frankly, the law was at the time of the offense. And have you ever raised this argument that the pre-Chapman, that it would be a windfall to give for the benefit of the post-Chapman Bay view of the world? We have not, although we were happy to adopt the court's suggestion. At least in this case, yeah. I have some suggestions for Mr. Schauf. He may want to address this. If the court has nothing further. Thank you. So there's four points I'd like to make. The first one is a very minor one. Chief Judge Golland, on your question of whether the government agrees with us that the commission has to follow D.C. law, another place to look for that is JA56, their answer where they concede that they have to do this. Getting into the broader ex post facto issues, again, Chief Judge Golland, I think you're exactly right, that the key point here is Ford has never received the hearing that he is entitled to under the applicable D.C. law. He's never had a hearing where his grid score has reflected all of the rehabilitation he's put in since he's been incarcerated. Judge Srinivasan. Is that true? I understand he doesn't get the full zero yet, but at each second stage, that is, after each set off, hasn't he then at that point had that benefit? He's gotten each incremental. In the example I'm trying to think of as three when it should have been a two, two when it should have been a one, one when it should have been a zero. By the time he gets the one, doesn't he get all the benefit? The grid score goes down to zero. I appreciate the last point, the zero point, but at one, hasn't he had all the benefit until then? He hasn't had it at the time. That's correct. I don't think the hearing he had in 2016 is a light for light substitute with the hearing he should have had in 2012, when he should have come to commission with both this favorable hearing officer recommendation he received and also a lower grid score, which I think should have either been zero or one, depending on how you do the math about what would have happened had the hearing started at the right time. By the time he gets to one, he's been in there longer. He's been able to show even more rehabilitation, et cetera. Isn't it speculative, really speculative to think that when he was in there for a shorter time, if he had gotten the one, it would have made a difference? I think when we're looking at these discretionary decisions, you should give some leeway for a broad range of facts potentially mattering. I think that's sort of in the nature of this discretionary world that we are in. It's certainly true that nothing happened between 2012 and 2016 that made him a worse risk. Judge Srinivasan, you asked the hypothetical, what if it were clear that the commission was looking at the grid score and taking that into account? I think what I would say about that is, number one, the commission has never said that isn't what it's doing, and that the grid score just has to matter. It has to be true in the general case that someone with a grid score of three, it's going to be easier to depart than someone with a grid score of two or one. And then we can talk about, for himself, the question of whether he can show a sufficient or significant risk as applied to his case. Again, the commission has never said it's simply ignoring the grid score for Ford. And indeed, there's lots of facts to make you think that if what you're looking for is an incremental difference that the grid score can make, he's the kind of person for whom this matters. I mean, my friend on the other side talked about, well, at some point, he might be too old to pose a risk. He's 70 years old, nearly, has been in prison for 38 years, never had any violent conduct in prison, and has done a really exemplary job in rehabilitation for all the reasons we say in our brief. And yet, his grid score has dropped every time he's come before the commission, but still does not reflect the true degree of risk that he represents under District of Columbia law. So if we give the remedy you proposed, which is to recalculate everything, and they come to the same result, then what would your argument be? I mean, if they come to the same result after calculating the grid score properly, then at least this first argument about the DC code, he's had his remedy. And there also, I think, wouldn't be an ex post facto argument. That's right. It would just be an argument that they misapplied, and he would, I don't know, appeal administratively his denial. That's right. There's, I think, administrative appeals of these DC code decisions. There's not a judicial appeal. But there's no way, I think, if they did that, that he could show an ex post facto violation because he would receive the equivalent of what he should have gotten, and that's what he's asking for here. If there's nothing further, questions? Thank you very much. We'll take the matter under submission. Mr. Shelf, you undertook this at the request of the court, and we're grateful for your assistance. Thank you, Your Honor.
judges: Garland, Griffith, Srinivasan